**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF INDIANA**

TRINA  WILKINS; JAMES BISHOP; LISA )
BISHOP;   AMBER BRITTON; TONI )
CORDOVA; JOHN CORTINA; JILL )
CORTINA; GEORGE DEMKO; DOVAN )
HELTON; MARY HELTON; )
NATE BROOKS; SYDNEY JOHNSON; )   No: 4:20-cv-50
PLAINTIFF D.J.; DAMON LAFORCE; )
MICHAEL MASULA; ERIN MASULA; )
JAMES MATTHEWS; THOMAS )
OLSZEWSKI; DARLENE )
COOKINGHAM; THOMAS STANZIANO; )
WENDY STANZIANO; EDDIE VIERS, )
individually as surviving spouse of Teresa ) **ORAL ARGUMENT REQUESTED**
Viers, deceased, AND as Personal )
Representative of the ESTATE OF )
TERESA VIERS;  WILLIAM MCNEW; ).
JEANNE WALLACE individually as )
surviving spouse of Joseph Wallace, )
deceased, AND as Personal Representative )
of the ESTATE OF JOSEPH WALLACE; )
JAMES WALLACE; and SAMUEL )
WALLACE; )
)
      Plaintiffs, )
)
        v. )
)
SANOFI CORP., )
)
      Defendant )

1

COMPLAINT

AND NOW come Plaintiffs, by and through their attorney, and file this Complaint. In support thereof, Plaintiffs aver as follows:

PARTIES

1.      Plaintiff Trina Wilkins is an adult individual who currently resides in Charlestown, IN, but for purposes of lex loci delicti was a resident of Carrolton, KY and IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  She was injected with defective Fabrazyme from 2009 to 2012.  Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, anaphylactic infusion reactions, venous collapse, vascular thrombosis, neuropathy, chronic pulmonary obstructive disease, chronic debilitating fatigue, multiple transischemic attacks, chronic gastrointestinal distress including uncontrollable diarrhea, Fabry crises, depression, seizures, and recurrent urinary and kidney infections, pulmonary granuloma, and as a result of infection, MRI spots were detected on Plaintiff's liver, indicative of hepatitis.   Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

2.      Plaintiff James Bishop is an adult individual with Fabry disease who currently resides in Westfield, MA. Plaintiff was on treatment with FDA-approved doses of

2

Fabrazyme prior to June 2009. However, he was injected with defective Fabrazyme from 2009 to 2012. In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria that includes but is not limited to: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, acroparesthesias, chronic debilitating fatigue, heat intolerance, nephropathy, vestibular balance disorder, proteinuria, atrial fibrillation requiring cardioversion, and chronic gastrointestinal distress including uncontrollable diarrhea. Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

3.      Plaintiff Lisa Bishop is an adult individual who currently resides in Westfield, MA and is the spouse of James Bishop.

4.      Plaintiff Amber Britton is an adult individual with Fabry disease who currently resides in Kirkland, WA. Plaintiff was prescribed FDA-approved doses of Fabrazyme in 2009. She was denied access to the drug until 2012. In 2013 and 2015, she was injected with defective Fabrazyme containing vesivirus. Her injuries are increased risk of developing fulminating vesivirus infection and vesivirus induced hematological cancer. Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

5.      Plaintiff Toni Cordova is an adult individual with Fabry disease who currently resides in Reno, NV. Plaintiff was banned treatment with Fabrazyme until January 2010. She was injected with defective Fabrazyme from 2010 to 2012. In 2013 and 2015, she was again injected with defective Fabrazyme containing vesivirus. Plaintiff's clinical

status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, stroke, transischemic attacks presenting as strokes, white matter deposition in the brain (inflammatory foci), neuropathic pain, chronic debilitating fatigue, and chronic gastrointestinal distress including uncontrollable diarrhea.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

6.      Plaintiff John Cortina is an adult individual with Fabry disease was a resident of Brewster, NY at all times during which the injuries were sustained, but now resides in North Carolina.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, acroparesthesias and cardiovascular hypertension. Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

7.      Plaintiff Jill Cortina is an adult individual who currently resides North Carolina is the spouse of John Cortina.

8.      Plaintiff George Demko is an adult individual with Fabry disease who currently resides in Pittsburgh, PA.  Plaintiff was on treatment with FDA-approved doses of

4

Fabrazyme prior to June 2009. He was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, neuropathic pain, memory loss, arterial blockage, and chronic debilitating fatigue. Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

9.      Plaintiff Mary Helton is an adult individual with Fabry disease who currently resides Charlestown, IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  She was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, she was again injected with defective Fabrazyme containing vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:   immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, transischemic attacks presenting as stroke, intracranial hypertension, optic nerve swelling, vision loss, hearing loss, neuropathic pain, multiple Fabry Crises, cardiac arrhythmia, chronic debilitating fatigue, and progression of kidney disease.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

10      Plaintiff Nate Brooks currently resides in Charlestown, IN and is the spouse of Mary Helton.

5

11.     Plaintiff Donovan Helton is an adult individual with Fabry disease who currently resides in Clinton, IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was injected with defective Fabrazyme from 2009 to 2012.  Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, heart arrhythmia, chronic debilitating fatigue, heat intolerance, transischemic attacks, proteinuria, multiple Fabry crises, and neuropathic pain.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

12.     Plaintiff D.J. ("Plaintiff D.J.") is a minor with Fabry disease represented by and through guardians Chastity and Jeremy Johnson, who currently resides in Wise, VA.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, hypohidrosis and debilitating fatigue.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

13.     Plaintiff Sydney Johnson is an adult with Fabry disease who currently resides in Wise,

6

VA.   Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. She was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, she was again injected with defective Fabrazyme containing vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, hypohidrosis and debilitating fatigue.

14.     Plaintiff Damon LaForce is an adult individual with Fabry disease who currently resides in San Pedro, CA.  While a resident of Virginia, Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus.:   immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, debilitating fatigue, neuropathy, anaphylactic infusion reactions, and acroparesthesias.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

15.     Plaintiff Michael Masula is an adult individual with Fabry disease who currently resides in Pittsburgh, PA.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular

globotriaosylceramide deposition, transischemic attacks presenting as stroke, neuropathic pain, acroparesthesias, dental erosion and loss of teeth, and chronic gastrointestinal distress including uncontrollable diarrhea, and viremic lesions.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

16.     Plaintiff Erin Masula is an adult individual who currently resides in Pittsburgh, PA and is the spouse of Michael Masula.

17.     Plaintiff James Matthews is an adult individual with Fabry disease, who currently resides in Indian Trail, NC.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition,  end stage renal disease (stage V) requiring dialysis, kidney transplant, complications of the first kidney transplant leading to dialysis and currently requiring a second kidney transplant, heat intolerance; neuropathy, fatigue, anhidrosis.  Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

18.     Plaintiff Thomas Olszewski is an adult individual with Fabry who currently resides in Grayling, MI.  He was injected with defective Fabrazyme from 2009 to 2012. In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus.

8

Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, chronic obstructive pulmonary disease, neuropathic pain, acroparesthesias, and chronic debilitating fatigue. Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

19.     Plaintiff Darlene Cookingham is an adult individual who currently resides in Grayling, MI and is the spouse of Thomas Olszewski.

20.     Plaintiff Tom Stanziano is an adult individual who currently resides in Oldsmar, FL. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was injected with defective Fabrazyme from 2009 to 2012. In 2013 and 2015, he was again injected with defective Fabrazyme containing vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has progressed and been accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, anaphylactic infusion reactions, acroparesthesias, hearing loss, depression, insomnia, and progression of renal disease. Plaintiff also was injured by paying over $200,000 for medically worthless Fabrazyme.

21.     Plaintiff Wendy Stanziano is an adult individual who currently resides in Oldsmar, FL and is the spouse of Tom Stanziano.

22.     Plaintiff Eddie Viers is an adult individual who currently resides in Grundy, VA

9

and was the spouse of Teresa Viers.  Eddie Viers is the Administrator of the Estate of

Teresa Viers, who was on treatment with FDA-approved doses of Fabrazyme prior to

June 2009, and died due to the effects of defective Fabrazyme administered from 2009 to

2012, and in 2013, and in 2015 as evidence by :  immunological sensitization to

Fabrazyme, vascular globotriaosylceramide deposition,  recurrent febrile illness, chronic

debilitating fatigue, exercise intolerance, heat intolerance, neuropathic pain, recurrent

kidney infections, anaphylactic infusion reaction, increased hemoglobin count, increased

creatinine, progression of kidney disease, proteinuria, and enlargement of the heart that

all contributed to her death in September of 2019.  Plaintiff also was injured by paying

over $200,000 for medically worthless Fabrazyme.

23.     Plaintiff William McNew is an adult individual who currently resides in Grundy, VA and

is the surviving son of Teresa Viers.

24.     Plaintiff Jeanne Wallace is an adult individual who currently resides in Richmond,

VA and was the spouse of Joseph Wallace.  Jeanne Wallace is the executor of the Estate

of Joseph Wallace, who was on treatment with FDA-approved doses of Fabrazyme prior

to June 2009 and died due to the effects of defective Fabrazyme administered from 2009

to 2012 and in 2013 as evidence by:  immunological sensitization to Fabrazyme:

immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition,

and acroparesthesias that all contributed to his death.  Plaintiff's estate was also injured

by paying over $200,000 for medically worthless Fabrazyme.

25.     Plaintiff James Wallace is an adult individual that resides in Nashville, TN and is a

surviving son of Joseph Wallace.

26.     Plaintiff Samuel Wallace is and adult individual who currently resides in Richmond, VA

and is a surviving son of Joseph Wallace.

27.    Defendant SANOFI is a French corporation manufacturing the drug "Fabrazyme,"

with its U.S. headquarters located 55 Corporate Drive, Bridgewater, NJ 08807.  SANOFI sells

Fabrazyme through its wholly owned subsidiary GENZYME-SANOFI (GENZYME).

GENZYME does regular business in Indiana and throughout the United States.


JURISDICTION AND VENUE

28.    Jurisdiction is conferred upon diversity jurisdiction and over the Classes (as

hereinafter defined) pursuant to 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action

Fairness Act of 2005, because one or more members of the Classes are citizens of a State

different from one or more Defendants, and the aggregate amount in controversy exceeds

five million dollars ($5,000,000), exclusive of interest and costs.

29.    GENZYME-SANOFI is a subsidiary of SANOFI, French corporation with its

U.S. headquarters in New Jersey.

30.    Furthermore, Defendant Genzyme has sufficient contacts within the state of

Indiana and have purposely availed themselves to conduct business within the state, as to

permit the Southern District of Indiana to exercise personal jurisdiction.

31.    Additional out-of-state Plaintiffs join the instant case under the Rule 20(a)(1)(A)

and (B) of the Federal Rules of Civil Procedure, as all injuries arose from a fact

common to all Plaintiffs and present a common question of law.

## FACTUAL BACKGROUND

32.     Fabry disease is a rare but lethal heritable genetic illness that occurs in approximately 1 in 3000 births, and, without treatment, results in the premature death of Fabry patients from complications such as renal disease, cardiac disease, and disease of the central nervous system.

33.     In Fabry Disease, the gene for an enzyme (alpha-galactosidase) required to metabolize a certain fat ( globotriaosylceramide termed "GL-3) is mutated or missing resulting in the buildup this GL-3 in cells, blood vessels, and organs that cause inflammation and ultimately leads to death, usually from strokes, kidney failure, and heart enlargement.

34.     While no cure for Fabry disease is yet available, one of the greatest breakthroughs in scientific research on Fabry disease has been enzyme replacement therapy where a synthetic version of the enzyme, Fabrazyme (agalsidase beta), can be injected every two weeks to effectively treat Fabry patients.

35.      Fabrazyme infusions temporarily compensate for the absent or mutated agalsidase enzyme by clearing GL-3 buildup from the system.

36.     Fabrazyme does not reverse damage from Fabry disease but can mitigate the effects of GL-3 deposition.

37.     Fabrazyme is rapidly metabolized so it must be administered every two weeks

38.     Fabrazyme treatment generally costs over $600,000 per year per patient.

39.     In April of 2003, the United States Food and Drug Administration ("FDA") granted rapid orphan drug approval for GENZYME to exclusively market and sell Fabrazyme for treatment of Fabry patients throughout the United States.

## Vesivirus 2117 (Allston) (of the Calicivirus family) adulteration

40.     Sometime prior to July 2009, GENZYME contaminated its bioreactors with vesivirus 2117 (Allston), a genus of calicivirus.[1]  Qui Y., *et al.* "Identification and quantitation of Vesivirus 2117 particles in bioreactor fluids from infected Chinese hamster ovary cell cultures." *Biotechnol Bioeng.* 2013 May;110(5):1342.

41.     Vesiviruses are classified as a Category B biodefense pathogens by the National Institute of Allergy and Infectious Diseases.

42.     Category B biodefense pathogens are the second highest priority for national security and public health, and the class includes ricin toxin, zika virus, and *salmonella*.  *See* calicivirus at https://www.niaid.nih.gov/topics/biodefenserelated/biodefense/pages/cata.aspx.  Category A more serious pathogens such as Ebola and anthrax while Category C pathogens include less serious pathogens such as influenza, hanta virus, and coronavirus (SARS).

43.     No safe level of exposure to vesivirus or its viral fragments exists.

44.     Vesivirus has not been approved or recommended for use to treat Fabry disease.

45.     At least as early as July 2009, GENZYME contaminated "Fabrazyme" with vesivirus, that it termed vesivirus 2117 (Allston) for the manufacturing facility where it had been detected.

46.     Instead of incinerating the vesivirus 2117 (Allston) infected Fabrazyme as required by the FDA or recalling the drug, GENZYME sold these particular contaminated lots to patients, including WILKINS.[2]

47.     In order to sell the virus-contaminated drug to patients, Genzyme told Fabry patients that

---

[1] Fabrazyme is produced in bioreactors which are similar to fermentation tanks.  Genetically engineered Chines hamster ovary cells "CHO" cells secrete the human agalsidase enzyme into the cell growth medium.
[2] As defined in Indiana Code § 16-42-3-3: Adulterated drug or device and Indiana Code § 16-42-3-4 Misbranded drug or device.

vesivirus 2117 (Allston) was safe to be injected into human beings, which it internally knew was false and misleading.

48.   Vesivirus contaminated Fabrazyme was sold without a warning that the drug was adulterated with a virus.

49.   Virus contaminated injectable drugs are always unsafe for human use.[3]

50.   GENZYME issued a letter in privity with WILKINS, and the other plaintiffs, to encourage her and other patients to be injected with vesivirus infected Fabrazyme as well as justify the six-figure costs of the vesivirus infected Fabrazyme vials.

51.   Specifically, GENZYME Director of Medical Affairs, Daniel Gruskin, M.D., told WILKINS, and the other plaintiffs, in a 2009 letter that, "This virus, Vesivirus 2117, is not known to be harmful in humans, but impairs the viability of CHO [Chinese Hamster Ovary Cells] which are used to produce Cerezyme and Fabrazyme."

52.   GENZYME also stated publicly that "While the virus has the ability to taint the drugs, it is not considered harmful to humans." *See* Ailworth and Weisman, Boston Globe, *Virus shuts GENZYME plant, holds up drugs for 8,000* June 17, 2009 (http://www.boston.com/business/healthcare/articles/2009/06/17/genzyme_temporarily_halts_ production_on_2_key_drugs/).

53.   Researchers had previously demonstrated that vesivirus can cross species barriers to infect and kill human embryo cells over twenty years ago.  *See*, Seal, et al., "Isolation of

---

[3] It is scientifically well established that virus infected biologicals have absolutely no valid medical use. <u>See</u> HIV and the Blood Supply: An Analysis of Crisis Decision Making (discussing the issue of whether to give patients HIV-infected blood transfusions).  https://www.ncbi.nlm.nih.gov/books/NBK232419/

caliciviruses from skunks that are antigenically and genotypically related to San Miguel sea lion virus," Virus Research 37:1-12 (July 1995).

54.    Vesivirus was also known to be dangerous to humans because vesivirus establishes a persistent infection in primates and the virus easily crosses species barriers.  Alvin Smith, et al., "Calicivirus Isolation and Persistence in a Pygmy Chimpanzee (*Pan paniscus*)" *Science* 4605:79-81 (1983); Alvin Smith, et al. "Calicivirus Emergence from Ocean Reservoirs: Zoonotic and Interspecies Movements," *Emerging Infectious Diseases*, 1:13, (1998).

55.    Internally, Genzyme knew that acute vesivirus infections cause disease in humans with clinical observations of viremia, vesicular skin lesions, antigenicity, antibody seroconversion, B-cell stimulation, hepatitis, and spontaneous abortions.  Alvin Smith, et al. "*Vesivirus viremia and seroprevalence in humans.*" J Med Virol. 78(5):693-701 (2006); Heetae, et al "*Elevated post-transfusion serum transaminase values associated with a highly significant trend for increasing prevalence of anti-Vesivirus antibody in Korean patients*," J Med Virol, 84(12): 1943–1952 (Dec. 2012).

56.    Genzyme interviewed Dr. Alvin Smith, a leading expert on vesiviruses cited *supra*, for a job in assisting remediation efforts in 2009.

57.    Dr. Smith pointed out to Genzyme that the adulterated Fabrazyme would likely harm humans and delineated the symptoms that Genzyme should monitor for Fabry patients that were injected with vesivirus contaminated Fabrazyme.

58.    Genzyme decided not to hire Dr. Smith and decided not to monitor any of the Fabry patients for symptoms of vesivirus infection or change the warning labels.

59.    In May 2010, the FDA and Department of Justice obtained a consent decree against Genzyme, which included a $175 million dollar fine and oversight of the manufacture of

15

Fabrazyme for at least seven years.

60.     In 2011, researchers confirmed that "Agents [such as the calicivirus, vesivirus 2117], that were not believed to be of concern for cattle or swine may cross species barriers. Concern also exists for agents that are not obviously productively infectious for humans or for human cells *in vitro*, because they may have the potential to become latent and may be oncogenic [cancer-causing] in non-host species."  Marcus-Sekura, et al. "Evaluation of the Human Host Range of Bovine and Porcine Viruses that may Contaminate Bovine Serum and Porcine Trypsin Used in the Manufacture of Biological Products," *Biologicals*. 6:359-69, FN3 (2011); *Id*. at p.368, para. 4.7 (*emphasis added*).

61.     According to a former Genzyme scientist conducting purity testing in the new Framingham plant, vesivirus contamination was again detected by polymerase chain reaction (PCR) tests on at least three occasions in 2013 and at least once in 2015, as had initially occurred in the former Genzyme Allston plant in 2008 and 2009, and the Geel plant.

62.     All of the viral strains are closely related genetically and were derived from the same progenitor virus.

63.     When senior management at the Framingham plant was informed about each new positive contamination report, the management dismissed the vesivirus PCR contamination tests as "false positives."

64.     However, GENZYME'S standard operating procedure after obtaining a positive PCR test was supposed to be A) further checking for viral particles using electron microscopy, B) attempting to culture and sequence the genome of the potential viral contamination, C) notifying compliance officers and legal counsel, and D) notifying the FDA.  See, for example, Qui Y., *et al.* "Identification and quantitation of Vesivirus 2117 particles in bioreactor fluids from infected

Chinese hamster ovary cell cultures."  Biotechnol Bioeng. 2013 May;110(5):1342.

65.    None of the internal standard safety procedures were followed by GENZYME. Its scientists' concerns were ignored.  Its compliance and legal advisors were bypassed.  The FDA and Department of Justice were not informed of the Framingham test results despite the ongoing oversight from the 2010 consent decree.

66.    The 2013 and 2015 vesivirus contaminated Fabrazyme was distributed to all U.S. Fabry patients without their knowledge or warnings.

67.    GENZYME intentionally sold vesivirus contaminated Fabrazyme in 2013 and 2015 to WILKINS, and the other surviving plaintiffs, with which they again were injected and injured.

68.    Genzyme is (and remains) under a legal duty to report these positive test results to the FDA and is also under a duty to conduct additional post-surveillance investigations under the supervision of the FDA.

69.    In September of 2016, GENZYME published its own research disclosing at least one additional danger of vesivirus 2117 (Allston)—the vesivirus attaches to human cells for at least two weeks. Plavsic, et al., *Caliciviridae* and *vesivirus* 2117. *BioProcess. J.* 2011:9, 6.

70.    Virus protein attachment in itself activates cell defense mechanisms that are dangerous including inflammatory responses and cell death. Mogensen, et al., "Molecular pathways in virus-induced cytokine production." *Microbiol Mol Biol Rev*. 2001;65(1):131–150. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC99022/.    *See also* Peñaflor-Téllez et al., Immune Response Modulation by Caliciviruses. *Front Immunol*. 2019:10, 2334.  Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6779827/.

71.    Viral inactivation/filtration procedures used on contaminated Fabrazyme still rendered it unsafe for human use because inactivation does not remove the small molecular weight viral

proteins; therefore, the drug still contains decomposed and filthy substances manufactured in such a manner that drug "may have been contaminated with filth or made injurious to health." Indiana Code 16-42-3-3.

72.     In human vesivirus infection, at least one target cell surface molecule has been identified as a binding ligand: human Junctional Adhesion Molecule-1 (JAM-1). Sosnovtsev SV, et al. "Identification of Human Junctional Adhesion Molecule 1 as a Functional Receptor for the Hom-1 Calicivirus on Human Cells," *M. Bio.* 2017; 8 (1): 1-17.

73.     JAM-1 molecule, also known as JAM-A, is expressed in adult bone marrow, embryonic cells and fetal liver cells.  Sugano, Y., et al., "Junctional adhesion molecule-A, JAM-A, is a novel cell-surface marker for long-term repopulating hematopoietic stem cells," Blood, 2008; 111 (3): 1167-1172.  Mere binding of human JAM-1 to cells activates immunological inflammation.

74.     The vesivirus family of viruses is particularly dangerous to females.

75.     In pigs, vesivirus infections (known as vesicular exanthema of swine virus "VESV") can occur with concurrent diarrhea, as well as abortion, stillbirth, cessation of milk production, mortality in the infant pigs and weakness or death in growing pigs.  In sea mammals, vesivirus is associated with abortion, premature births, encephalitis, and pneumonitis. Knowles, N.J. et al. "Vesicular Exanthema of Swine Virus," p. 138, Chapter 16, Molecular Detection of Animal Viral Pathogens, ed. Liu, (CRC Press, 2016). In humans, vesivirus "caused systemic infections illness including vesicular lesions on all four extremities." *Id*.

76.     Vesivirus 2117 (Allston, Geel, and Framingham) were all grown (albeit unintentionally) exclusively in ovarian cells, thereby creating a viral tropism or preference for infecting ovarian tissue.

18

77.     Epidemiologically, the incidences of pre-eclampsia, pre-term birth, and other birth complications are increasing in the FDA adverse event reporting database (AERS) for Fabrazyme patients who were exposed in 2009, 2013, and 2015 to batches of vesivirus contaminated Fabrazyme.

78.     The incidence of hematological cancer in Fabrazyme patients who were exposed in 2009, 2013, and 2015 to batches of vesivirus contaminated Fabrazyme is also increasing according to the database.

79.     The incidences of dissecting folliculitis of the scalp and non-allergic skin blistering have similarly increased after the contaminations.

80.     GENZYME has the expertise, specialized reagents, ability and duty to test and monitor patients for both infection to vesivirus using PCR and exposure by enzyme-linked immunosorbent assay (ELISA).  Qui Y., *et al.* "Identification and quantitation of Vesivirus 2117 particles in bioreactor fluids from infected Chinese hamster ovary cell cultures." *Biotechnol Bioeng*. 2013 May;110(5):1342.

81.     GENYZME already tests its customer's blood for DNA positive for Fabry disease by PCR, GL-3 buildup by ELISA over time, and anti-Fabrazyme antibodies by ELISA over time.

82.     GENYZME states in its FDA warning label that it undertakes a special duty to women in particular to monitor the effects of Fabrazyme on their reproductive health and safety.[4]

_____

[4] Fabrazyme FDA label, Exhibit A:  17. PATIENT COUNSELING INFORMATION Patients should be informed that a Registry has been established in order to better understand the variability and progression of Fabry disease in the population as a whole and in women [see Use in Specific Populations (8.6)], and to monitor and evaluate long-term treatment effects of Fabrazyme. *Emphasis added.*

83.     GENZYME should test and monitor all of the patients who were exposed to vesivirus, including the named plaintiffs as it already does for GL-3 and anti-Fabrazyme antibodies.

**Improperly Dosed Fabrazyme**

84.     In 2009, only limited manufactured stocks of the adulterated Fabrazyme were left of the vesivirus contaminated Fabrazyme, so GENZYME recommended a new and untested method of treating Fabrazyme patients with what Genzyme called "low dose" Fabrazyme.

85.     "Low dosing" Fabrazyme consisted of selling U.S. patients only one-half to one-third or less of the prescribed, FDA approved dosage.

86.     The FDA only approved Fabrazyme to be given at 1mg/kg administered every two weeks as described on the label and prescribed by physicians.  See FDA label Exhibit A incorporated by reference herein.

87.     Genzyme "low-dosed" U.S. Fabry patients from July 2009 until early 2012, despite being prescribed a normal dose for unadulterated Fabrazyme.

88.     Sometimes, GENZYME "low-dosed" patients by providing a two-week supply that was to be administered over one month.

89.     More often, patient's treatment interval would be a two-week dose to be administered over three months, and in one instance over six-months.

90.     Changing the dose frequency of Fabrazyme caused yet more injuries to Fabry patients than if they had been given nothing at all.

91.     The drug regulatory body for Europe, the European Medicines Agency, was monitoring "low-dosing" for Europeans when Genzyme tried "low dosing."

92.     After three months, adverse event reports in Europe showed that "low dosing" was increasing the incidence of Fabry-related injuries and accelerating the disease process in

European Fabry patients.

93.     Europe banned "low-dosing" entirely and required GENZYME to change the label to warn patient of the possible side effects of accelerating the Fabry-disease process. See Fabrazyme (Europe) post marketing warning label Annex 1 page 8, Exhibit B, and EMA post marketing surveillance report Exhibit C incorporated by reference herein.[5]

94.     GENZYME did not, and still has not, changed the label in the U.S. to reflect the clinically observed dangers of "low dosing."

95.     GENZYME has never studied the short term or long-term effects of "low dosing" on American Fabry patients.

96.     GENZYME's instructions to "low dose" violated a fundamental scientific foundation of drug safety in modern molecular pharmacology and medical posology.

97.     Chemically, Fabrazyme is a protein. Proteins can inherently induce anaphylaxis but are more likely to induce this reaction at low doses—termed "sensitization."

98.      "Low dosing" a protein like Fabrazyme, increases the likelihood that Fabrazyme will induce an immune response against Fabrazyme itself because the immune system is more likely to interpret low-dose protein as pathogenic and become hypersensitive to subsequent injections.

99.     Concomitantly, "low dosing" decreases the effectiveness of the drug because lower doses do not effectively clear the GL-3 from a Fabry patients' system—and, independently, the Fabry disease process itself is accelerated as observed by the European Medicines Agency.

_____

[5] EMA label p. 8.  In the postmarketing setting, experience was gained in patients who initiated treatment at a dose of 1 mg/kg every 2 weeks and subsequently received a reduced dose for an extended period. In some of these patients, an increase of some of the following symptoms was spontaneously reported: pain, paraesthesia and diarrhoea, as well as cardiac, central nervous system and renal manifestations. These reported symptoms resemble the natural course of Fabry disease.

100.   As a result of "low-dosing", Genzyme had eliminated the therapeutic window for treating Fabry disease with Fabrazyme (lacking therapeutic effect while enhancing the likelihood of known side-effects)—notwithstanding the fact that the Fabrazyme was adulterated with vesivirus and glass, rubber and steel particles as well.

101.   GENZYME intentionally avoided warning patients that the therapeutic window for "low dose" Fabrazyme was effectively non-existent and the risk of sensitization was increased.

102.   GENZYME never changed the label in the U.S. like it did in Europe, despite the greater length of time Americans were "low-dosed" and the far greater diminution of the dose than even those experienced by European (20% or less than the recommended dosages for Americans).

103.   GENZYME, therefore, foresaw all of the detrimental effects of "low doses" on Americans.

104.   GENZYME could and should have mitigated the effects of the virus-contaminated, particulate contaminated, "low dose" Fabrazyme under Indiana law by providing "adequate directions for use; and adequate warnings… against <u>unsafe dosage or methods or duration of administration</u> or application in the manner and form that is necessary for the protection of users." *Emphasis added*. Indiana Code 16-42-3-4 (6)(b).

105.   As a result of Genzyme's defective "low dosing" over the span of more than two years, WILKINS lost 80% of her hearing--far faster than would have occurred if she had not treated at all.

106.   As a result of Genzyme's defective "low dosing" over the span of more than two years, WILKINS experienced accelerated cardiac swelling and heart arrhythmia.

107.   As a result of Genzyme's defective "low dosing" over the span of more than two years,

WILKINS experienced multiple trans-ischemic attacks (i.e., ministrokes) which she never had prior to "low-dosing," resulting in rapid, significant, and permanent loss of cognitive function including loss of short-term and long-term memory.

108.    As a result of Genzyme's defective "low dosing" over the span of more than two years, WILKINS had unusually rapid progression of kidney disease from class I to class III in less than two years until "low-dosing" ended.

109.    By following GENZYME's defective "low-dosing" instructions, WILKINS experienced accelerated progression of kidney disease from class I to class III in less than two years and her kidney started shrinking which had never occurred until low-dosing.

110.    By following GENZYME's defective "low-dosing" instructions, WILKINS will likely require a kidney transplant in the future.

111.    As a result of Genzyme's defective "low dosing" over the span over the span of more than two years, WILKINS had severe neuropathic paresthesia (burning in hands and feet) that she had never experienced even before she went on Fabrazyme treatment.

112.    As a result of Genzyme's defective "low dosing" over the span over the span of more than two years, WILKINS' immune system was sensitized to Fabrazyme resulting in severe anaphylactic reactions (antibody mediated shock) when normal dosing resumed—a condition she did not have when being treated with Fabrazyme prior to 2009.

113.    After being sensitized by "low-dose" over the span over the span of more than two years, WILKINS required admission to a hospital intensive care unit for infusion and steroid treatment because every time she was infused with full-dose Fabrazyme (twice a month), her throat swelled shut cutting off her ability to breath, thereby requiring 24 to 48 hours of constant medical monitoring.

114.    Prior to "low-dosing," WILKINS was able to tolerate Fabrazyme and could receive home infusions without medical monitoring or use of steroid pre-medications.

## Combined Injuries from Improperly Dosed Fabrazyme containing Vesivirus, and Glass, Rubber, and Steel Particles

115.    Fabry disease itself is an inflammatory process that causes damage to the vascular system.

116.    Mechanistically, GENZYME would have expected that the underlying Fabry disease process would be accelerated by any one of the defects to the drug (pro-inflammatory vesivirus and its fragments and pro-inflammatory, glass, rubber, and steel particles and pro-inflammatory "low dosing.")

117.    Epidemiologically, GENZYME actually did observe that the Fabry disease accelerated process in European patients, which led to the ban of "low dosing" in Europe.

118.    As to the U.S. label on Fabrazyme, nothing was changed despite it having inadequate warnings because Fabry patients have the pathological condition where the drug's use may be dangerous to health and at an unsafe dosage with regard to the methods and duration of administration or application in the manner and form that is necessary for the protection of Fabry patients.

119.    As a result of being subjected to multiple inflammatory insults acting in concert, all surviving plaintiffs including WIKINS now has a worse clinical outcome than if they had been given no drug at all because of the merger of the inflammatory disease process created by the triply-inflammatory adulterated Fabrazyme cocktail.

24

120.     The severity of the Fabry symptoms become worse than pretreatment levels, including WILKINS' inflammatory processes.

121.     All of the surviving plaintiffs' life expectancy has been significantly shortened by being administered the inflammatory Fabrazyme cocktail from 2009-2015 as compared to having Fabry disease itself.

<u>CLASS ALLEGATIONS AT LEAST AS TO PAYMENTS FOR DEFECTIVE FABRAZYME</u>

122.     The preceding paragraphs are incorporated by reference as though set forth here in their entirely as is are all prior facts and claims averred in Adamo et al. v. Genzyme Corp., No. 13-11336 (D. Mass) and Hochendoner et al. v. Genzyme Corp., No. 11-10739 (D. Mass).

123.     At least for payment for defective Fabrazyme and the required medical monitoring, Plaintiffs are bringing this action on behalf of themselves and all others similarly situated, which includes any and all individuals residing in the United States who have been diagnosed with Fabry disease, and their spouses ("Classes").

124.     At least for payment for defective Fabrazyme and the required medical monitoring, the proposed Classes are so numerous that joinder of all members of the Classes is impractical and the administration of the claims as set forth herein on behalf of the Classes is more efficient and will benefit the parties and the Court.

125.     At least for payment for defective Fabrazyme and the required medical monitoring, the questions of law and fact common to the Classes predominate over the questions affecting only individual members of the Classes.

126.    At least for payment for defective Fabrazyme and the required medical monitoring, Plaintiffs' claims as set forth herein are typical of the claims of the Classes, as they have all suffered a similar harm as a result of the Defendants' actions and omissions.

127.    At least for payment for defective Fabrazyme and the required medical monitoring, Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes because their interests do not conflict with the interests of the individual members of the Classes. Plaintiffs have retained competent and experienced counsel to represent themselves and the members of the Classes.

128.    At least for payment for defective Fabrazyme and the required medical monitoring, adjudication of the re-payment claims set forth herein as a class action is superior to individual litigation of the claims, which would be impractical, expensive, and unduly burdensome to the Court.

## COUNTS

### COUNT I: NEGLIGENCE

JAMES BISHOP; AMBER BRITTON; TONI   CORDOVA;  JOHN CORTINA; GEORGE DEMKO; MARY  HELTON;   DONOVAN HELTON;  PLAINTIFF  D.J.; SYDNEY JOHNSON;  DAMON    LAFORCE;  MASULA; JAMES MATTHEWS; THOMAS   OLSZEWSKI;   THOMAS   STANZIANO;   TRINA          WILKINS; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI CORPORATION

129.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

130.    The injuries sustained by Plaintiffs were due to and were the direct and proximate result of the negligence, carelessness, and recklessness of Defendant Genzyme generally,

and under the following particulars:

    a.  in that Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

    b. in that Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

    c. in that Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass, and rubber;

    d.  in that the Defendant unilaterally devised, implemented, and approved with knowledge and consent the Genzyme Rationing Plan, and otherwise reduced or consented to reducing the dose of Fabrazyme or denied it entirely for treatment of Fabry patients;

    e. in that Defendant marketed and sold Fabrazyme vials contaminated with dangerous infectious and immunogenic virus, glass, rubber and steel particles United States with actual and constructive knowledge that the drug is too harmful to be used by anyone;

    f. in that the Defendant hid the danger of vesivirus infected Fabrazyme;

    g.  in that the Defendant instructed and through knowledge and consent reduced the dose of Fabrazyme to dangerous, sub-efficacious and unapproved levels to Americans based invidiously and irrationally discriminatory bases.

    h.  in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert and  substituting an illegal, "low dose", untested, adulterated and contaminated product that is of no known therapeutic benefit, nor as an approved equivalent for substitution of effective and pure prescription Fabrazyme;

    i.  in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009;

    j.  in that the Defendant failed to test or require the testing of the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease or report such effects;

    k.  in that the Defendant failed to provide adequate warnings, cautions, and directions concerning the dangers and limitations of the "low dose" of Fabrazyme that they observed or foresaw and expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements regarding medical safety of vesivirus injection as false;

    l.  in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease; and

    m.  in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

    n. in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain

disruptions;

o. in otherwise failing to exercise the care and caution that a reasonable, careful, and prudent entity would have or should have exercised under the circumstances; and

p. In that Defendant violated the following statutes, giving rise to negligence per se:

　　i. The Food, Drug, and Cosmetics Act 21 U.S.C. §351(a-d) regarding adulterated products;

　　ii. 21 USC §352(f) regarding adequate warning and labeling;

　　iii. 21 U.S.C. §355(j) regarding the statutory approval process for testing of previously unapproved doses;

　　iv. 21 U.S.C. §356a(a) regarding testing required for substantial manufacturing changes; and

　　v. The individual state statutes protecting Plaintiffs from adulterated or misbranded drugs in that the dosages being shipped were not in compliance (or even intended to be in compliance) with FDA approval or labeling at the time the drug left the control of the manufacturer or seller[6];

131.　As a direct and proximate result of Defendant's willful and wanton conduct, as set forth above, and reckless indifference to Plaintiffs' health and interests, Plaintiffs have sustained, or are at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature:

a.　renal injury;

b.　cardiac injury;

c.　neurological injury;

d.　peripheral pain;

e.　chronic abdominal pain and diarrhea;

f.　impairment of vision;

g.　impairment of hearing;

h.　increased severity and likelihood of infusion reactions,

i.　vesivirus infection, hepatitis, inoculation, seroconversion, and sensitization, and

j.　premature death and other serious and permanent injuries.

---

[6] KY (K.R.S. chapter 217 et seq.); MA (M.G.L. 94 §186 et seq.); MI (MI Comp L § 289.2107 et seq.); NC (G.S. § 14-34.4 et seq.); NV (N.R.S. § 585.010 et seq.); and VA (Va. Code § 54.1-3461 et seq.).

132.    As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged

as follows:

    a.   Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

    b.   Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

    c.   Plaintiffs have been and will be deprived of earnings and earning capacity;

    d.   Plaintiffs have suffered loss of enjoyment of life;

    e.   Plaintiffs have died or suffered a reduced life expectancy;

    f.   Plaintiffs' general health, strength, and vitality have been impaired;

    g.   Plaintiffs and their subrogators have expended large sums of money for a contaminated, adulterated, dangerous, and worthless medical treatment of Fabry disease.

WHEREFORE, Plaintiffs named in Count I demand judgment against Defendant,

Genzyme-Sanofi corporation  in an amount in excess of $75,000.00, together with costs of suit

and punitive damages as applicable. <u>JURY TRIAL DEMANDED</u>.

## <u>COUNT II: NEGLIGENCE <i>per se</i></u>

JAMES BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; MARY HELTON; DONOVAN HELTON; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; THOMAS STANZIANO; TRINA WILKINS; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI CORPORATION

133.    The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.

134.    By virtue of the negligence per se including  substitution of  a contaminated,

adulterated, "low dose", untested, mislabeled product in lieu of the  medically prescribed,

FDA-approved,  pure and non-"low dose" Fabrazyme, Defendant is liable for the severe

injuries and conditions of  named Plaintiffs

135.    As a direct and proximate result of the aforesaid injuries, named Plaintiffs and all

others similarly situated have suffered damages as set forth herein in Count III.

WHEREFORE, names Plaintiffs, individually and on behalf of all others similarly

situated, demand judgment against Defendant Sanofi Corporation in an amount in excess of

$75,000.00, together with costs of suit.

## COUNT III: STRICT LIABILITY

JAMES BISHOP; AMBER BRITTON; TONI   CORDOVA;  JOHN CORTINA;
GEORGE DEMKO; MARY  HELTON;   DONOVAN HELTON;  PLAINTIFF  D.J.;
SYDNEY JOHNSON;  DAMON   LAFORCE;  MASULA; JAMES MATTHEWS;
THOMAS  OLSZEWSKI;   THOMAS   STANZIANO;   TRINA      WILKINS;
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v.
SANOFI CORPORATION

136.    The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.287.    Defendant Genzyme is strictly liable to Plaintiffs as follows:

  a.  for failure to adequately and safely label the "low dose" of Fabrazyme;
  b.  for selling and licensing the use of Fabrazyme at a defective dose;
  c.  for selling Fabrazyme in a defective dosage and condition being adulterated
      with vesivirus pathogen, glass, rubber, and steel particles;
  d.   for selling and licensing the use of Fabrazyme at a "low dose" when the dose is
      untested and unreasonably dangerous for its intended use;
  e.  for failure to give adequate and complete warnings of the known or knowable
      dangers involved in the use Fabrazyme at a "low dose"; and
  f.  for causing patients to be injected with vesisivirus-containing Fabrazyme without
      prior testing or obtaining informed consent or disclosure of infection, risk virus
      association hepatitis, immunogenicity and risk of seroconversion and sensitization
      post-inoculation as well as concealing these medical facts found in prior medical
      literature.

By virtue of the strict liability of Defendant, Defendant is liable for the severe injuries

and conditions, as set forth herein for named plaintiffs, individually and on behalf of all

others similarly situated as set forth herein in Count III.

137.   As a direct and proximate result of the aforesaid injuries, the named plaintiffs, individually and on behalf of all others similarly situated  have suffered damages as set forth herein in Count III.

WHEREFORE, the named Plaintiffs, individually and on behalf of all others similarly situated demand judgment against Defendant,  <u>JURY TRIAL DEMANDED</u>.

<u>COUNT IV:  BREACH OF WARRANTY</u>
JAMES  BISHOP;  AMBER  BRITTON;  TONI        CORDOVA; JOHN  CORTINA;   GEORGE DEMKO; MARY HELTON;  DONOVAN HELTON;   PLAINTIFF   D.J.;        SYDNEY  JOHNSON;   DAMON LAFORCE;  MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; THOMAS STANZIANO;  TRINA  WILKINS;  INDIVIDUALLY AND ON BEHALF  OF  ALL  OTHERS  SIMILARLY  SITUATED  v.  SANOFI CORPORATION

138.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

139.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and  proximately  from  Defendant  Genzyme's  breach  of  express  and  implied  warranties  of merchantability or fitness for the use of Fabrazyme, in the following particulars:

> a.  Defendant  expressly  warranted  in  the  Fabrazyme  product insert   that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product and inconsistent dosing reduces such deposition and having observed the contrary for the "low d s;
> b.  Defendant  expressly  warranted  in  the  Fabrazyme  product insert   that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;
> c.   the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;
> d.   Fabrazyme, given at "low dose" and being adulterated with glass, steel, and rubber particles, is not fit for the ordinary purpose for which it is customarily or foreseeably used;
> e.   the Defendant knew or should have known that the adulterated drug

and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

f.   Fabrazyme, given at "low dose" and being adulterated, was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

g.   the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, they should have provided the drug at the recommended dose;

h.   the Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, they should have provided warnings on the product to protect users;

i.   the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn users;

j.   the Defendant did not disclose to the users of the "low dose" of Fabrazyme that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

k.   the Defendant included an incorrect and unapproved product insert because Defendant do not allow physicians to treat patients with the recommended dose for which the insert was intended;

l.   the Defendant knew or should have known that users were relying upon the expertise of the Defendant in designing,   fabricating, manufacture,  testing, labeling as well as supplying Fabrazyme;

m.  in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009;

n.   in expressly and impliedly warranting that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

o.   in expressly and impliedly misrepresenting that a "low dose" of Fabrazyme was approved for by the FDA and efficacious for use in the treatment of Fabry disease.

p.   in expressly and impliedly misrepresenting that a "low dose" of Fabrazyme was approved for by the FDA and efficacious for use in the treatment of Fabry disease.

q.   i n  expressly and impliedly misrepresenting that injection with vesivirus-containing  Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements regarding medical safety of vesivirus injection as false;

140.   By virtue of the of the breach of these expressed or implied warranties of Defendant,

Defendant is liable for the severe injuries and conditions to the named plaintiffs individually and on behalf of all others similarly situated as set forth herein in Count IV.

141.    As a direct and proximate cause, the named plaintiffs, and others similarly situated suffered severe injuries and conditions as set forth herein in Count IV.

WHEREFORE, the named plaintiffs, and all others similarly situated suffered severe injuries and conditions as set forth herein in Count III, demand judgment against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with costs of suit. JURY TRIAL DEMANDED.


### COUNT V: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT  VIOLATION (F.S. § 501.201 *et seq.*) TOM STANZIANO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI CORPORATION

142.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

143.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme, generally, and in the following particulars:

     a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

     b.  in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;

     c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

    d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Florida citizens at various dates, but breached such promises repeatedly since June 2009;

    e.  in barring Florida physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Florida Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

    f.  in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite  having overwhelming knowledge to the contrary; and

    g.  in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

144.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Plaintiff Tom Stanziano individually and on behalf of all others similarly situated, as set forth herein in Count V.

145.    As a direct and proximate result of the aforesaid injuries, Tom Stanziano and others similarly situated have suffered damages as set forth herein in Count V.

WHEREFORE, Plaintiff Tom Stanziano demands judgment individually and on behalf of all others similarly situated, against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with costs of suit. JURY TRIAL DEMANDED.

### COUNT  VI: INDIANA  PRODUCTS  LIABILITY  ACT  VIOLATION
### (I.C.  § 34-20-1-1 et seq.)
MARY HELTON;  DONOVAN HELTON; TRINA WILKINS AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI CORPORATION

146.    The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.

147.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's practices regarding the manufacture, sale and use of the drug, Fabrazyme, generally, and in the following particulars:

   a.   in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;
   b.   in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;
   c.   in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass and rubber;
   d.   in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus, glass, rubber and steel particles;
   e.   in that the Defendant unilaterally devised, and willfully implemented treatment plan for Fabry patients contrary to what their physicians recommended;
   f.   in that the Defendant designed and implemented a plan to distribute a dose of Fabrazyme that was known to be injurious;
   g.   in that the Defendant instructed physicians and patients to use a "low dose" of Fabrazyme that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;
   h.   in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert;
   i.   in that the Defendant failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease;
   j.   in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the "low dose" of Fabrazyme;
   k.   in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;
   l.   in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;
   m.   in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;
   n.   in that the Defendant affirmatively represented that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

35

o.  in that the Defendant expressly or impliedly misrepresented that the "low dose" and adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Indiana  citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

s.  in that the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

t.  in that the Defendant  marketed and sold Fabrazyme, given at "low dose" and further being contaminated with vesivirus and adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used  and in contravention to IN anti-adulteration law (I.C. § 16-42-2-1 et seq.);

u.  in that the Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

v.  in that the Defendant  manufactured and sold Fabrazyme, given at "low dose" and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w. in that the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, it should have provided the drug at the recommended dose;

x.  in that the Defendant  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn physicians and users of known or knowable dangers;

z.  in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the  Defendant willfully included an incorrect and unapproved product insert  that does not apply to a "low dose";

bb. in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

cc. in that the Defendant expressly and impliedly warranted that a "low dose" of

Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd. in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false;

ee. in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease; and

ff. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

148.    By its actions, Defendant is liable for the severe injuries and conditions of the named Plaintiffs and on behalf of all others similarly situated, as set forth herein in Count VI.

149.    As a direct and proximate result of the aforesaid injuries, the named Plaintiffs, and all others similarly situated, have suffered damages as set forth herein in Count VI. WHEREFORE, the named plaintiffs individually and on behalf of all others similarly situated, demand judgment against Defendant Sanofi Corporation in an amount in excess of $75,000.00, together with costs of suit.   JURY TRIAL DEMANDED.

COUNT VII: PRODUCT LIABILITY  ACT OF KENTUCKY VIOLATION
(KY. REV. STAT. §411.300 et seq.)
TRINA WILKINS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED v. SANOFI CORPORATION

150.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

151.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant Genzyme's practices regarding the manufacture,

sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a.   in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

b.  in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.  in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass and rubber;

d.  in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus, glass, rubber and steel particles;

e.  in that the Defendant unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme or denied it entirely for treatment of Fabry patients despite physicians recommending a lawful and approved dose;

f.   in that the Defendant designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.   in that the Defendant instructed physicians and patients to use "low dose" of Fabrazyme that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.  in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert;

i.  in that the Defendant failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease;

j.  in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the "low dose" of Fabrazyme;

k.  in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

l.   in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;

m. in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.  in that the Defendant affirmatively represented that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit

from such use;

o.  in that the Defendant expressly or impliedly misrepresented that the "low dose" and adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

s.  in that the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

t.  in that the Defendant  manufactured and sold Fabrazyme, given at "low dose" and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.  in that the Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

v.  in that the Defendant  manufactured and sold Fabrazyme, given at "low dose" and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.  in that the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, it should have provided the drug at the recommended dose;

x.  in that the Defendant  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn physicians and users of known or knowable dangers;

z.   in that the Defendant did not disclose to the physicians and users that the dosing was  defectively and  unreasonably designed, thereby making the  product dangerous to use;

aa. in that the Defendant willfully included an incorrect and unapproved product insert that does not apply to a "low dose";

bb. in that the Defendant knew or should have known that physicians and users

39

were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

cc. in that the Defendant expressly and impliedly warranted that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd. in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false;

ee. in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease; and

ff. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

152.    By its actions, Defendant is liable for the severe injuries and conditions of Trina Wilkins, individually and on behalf of all others similarly situated, as set forth herein in Count VII.

153.    As a direct and proximate result of the aforesaid injuries, Trina Wilkins, and all others similarly situated, have suffered damages, individually and on behalf of all others similarly situated, as set forth herein in Count VII.

WHEREFORE, Plaintiff Trina Wilkins demands judgment individually and on behalf of all others similarly situated, against Defendant Sanofi Corporation in an amount in excess of $75,000.00, together with punitive damages where appropriate, and costs of suit. <u>JURY TRIAL DEMANDED</u>.

<u>COUNT VIII: KENTUCKY CONSUMER PROTECTION ACT VIOLATION</u>
<u>(KRS § 367.110 et seq)</u>
TRINA WILKINS,  INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED v. GENZYME-SANOFI CORPORATION

154.    The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.

155.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted

directly and proximately from Defendant Genzyme's deceptive acts or practices regarding the

sale and use of Fabrazyme, generally, and in the following particulars:

> a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;
>
> b.  in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;
>
> c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg <u>every two weeks</u> as detailed in the label;
>
> d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009;
>
> e.  in barring Kentucky physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Kentucky Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;
>
> f.  in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and
>
> g.  in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

156.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and

conditions of Trina Wilkins, individually, and on behalf of all others similarly situated, as

set forth herein in Count VIII.

157.    As a direct and proximate result of the aforesaid injuries of Trina Wilkins, and all others similarly situated, as set forth herein in Count VIII.

WHEREFORE,  Plaintiff  Trina  Wilkins, individually and on behalf of all others similarly situated, demand  judgment  against  Defendant  Genzyme  Corporation  in an amount  in  excess  of  $75,000.00,  together  with  punitive damages where appropriate, and costs of suit.  JURY TRIAL DEMANDED.

COUNT  IX:  MASSACHUSETTS  UNFAIR  AND DECEPTIVE TRADE
PRACTICES ACT VIOLATION  (Mass. Gen. Laws Ch. 93A § 1 et seq.)
JAMES BISHOP;  AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED v. GENZYME-SANOFI CORPORATION

158.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

159.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant Genzyme's deceptive acts or egregious practices

   a.  in  intentionally  failing  to  inform  the  Plaintiffs  that  the  dosage  given was unapproved and unauthorized and the possible consequences of such unapproved  and  unauthorized  use,  despite  having  warned  European patients of such dangers and recommended full dose treatment;
   b.  in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;
   c.  in  willfully placing  a  misleading  and  incorrect  label  with  the  product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;
   d.  in affirmatively representing that the drug given at full dosage every two weeks  would  be  sold  to  Massachusetts  citizens  at  various  dates,  but breached such promises repeatedly since June 2009;
   e.  in barring Massachusetts physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Massachusetts Fabry patients  from  receiving  an  FDA  approved  dose  as  mandated  by  the

FDA  and  in accordance with the indications of the product insert;

    f.   in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe  and  efficacious  for  use  in  treating  Fabry  disease despite   having overwhelming knowledge to the contrary; and

    g.   in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of  such  material  medical  claims  and  further  concealing  previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

160.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of James Bishop, individually and on behalf of all others similarly situated, as set forth herein in Count I.

161.   As a direct and proximate result of the aforesaid injuries, James Bishop, and all others similarly situated, have suffered damages, as set forth herein in Count IX.

    WHEREFORE, Plaintiffs James   Bishop,   individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation  in an amount in excess of $75,000.00, together with treble damages and costs of suit.  <u>JURY TRIAL DEMANDED</u>.

### <u>COUNT X: MICHIGAN STATE PRODUCT LIABILITY  ACT VIOLATION</u>
<u>(M.C.L. 600.2946 et seq.)</u>
THOMAS OLSZEWSKI; AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED v. SANOFI CORPORATION

162.   The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

163.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant's practices regarding the manufacture, sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a. in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

b. in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c. in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass and rubber;

d. in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus, glass, rubber and steel particles;

e. in that the Defendant unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme or denied it entirely for treatment of Fabry patients despite physicians recommending a lawful and approved dose;

f. in that the Defendant designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g. in that the Defendant instructed physicians and patients to use "low dose" of Fabrazyme that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h. in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert;

i. in that the Defendant failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease;

j. in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the "low dose" of Fabrazyme;

k. in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

l. in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;

m. in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n. in that the Defendant affirmatively represented that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o. in that the Defendant expressly or impliedly misrepresented that the "low

44

dose" and adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Michigan citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

s.  in that the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

t.  in that the Defendant  manufactured and sold Fabrazyme, given at "low dose" and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.  in that the Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

v.  in that the Defendant  manufactured and sold Fabrazyme, given at "low dose" and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w. in that the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, it should have provided the drug at the recommended dose;

x.  in that the Defendant  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn physicians and users of known or knowable dangers;

z.  in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the  product dangerous to use;

aa. in that the Defendant willfully included an incorrect and unapproved product insert  that does not apply to a "low dose";

bb. in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

cc. in that the Defendant expressly and impliedly warranted that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd. in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false;

ee. in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease; and

ff. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

164. By its actions, Defendant is liable for the severe injuries and conditions of Thomas, individually and on behalf of all others similarly situated,  as set forth herein in Count X.

165. As a direct and proximate result of the aforesaid injuries, Thomas Olszewski, and and all others similarly situated, have suffered damages, as set forth herein in Count X.

WHEREFORE, Thomas Olszewski, individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with costs of suit.   JURY TRIAL DEMANDED.

COUNT XI: MICHIGAN  STATE LAW DECEPTIVE TRADE PRACTICE
VIOLATION  (MICHIGAN  COMPILED LAWS § 445.903 et seq.)
THOMAS OLSZEWSKI; AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED v. SANOFI CORPORATION

166. The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

167. All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a. in intentionally failing to inform the Plaintiffs that the dosage given was

46

      unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b.  in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;

c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Michigan citizens at various dates, but breached such promises repeatedly since June 2009;

e.  in barring Michigan physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Michigan Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

f.  in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.  in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

168.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Thomas Olszewski and on behalf of all others similarly situated, as set forth herein in Count XI.

169.   As a direct and proximate result of the aforesaid injuries, Thomas Olszewski and all others similarly situated, have suffered damages, as set forth herein in Count XI.

      WHEREFORE, Plaintiff Thomas Olszewski individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation, jointly and severally in an amount in excess of $75,000.00, together with costs of suit. JURY TRIAL

DEMANDED.

COUNT XII: NEVADA STATE LAW DECEPTIVE TRADE PRACTICE
VIOLATION (N. R. S. §§ 598.0903-0990)
TONI CORDOVA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED v. SANOFI CORPORATION

170.    The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.

171.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted

directly and proximately from Defendant Genzyme's deceptive acts or practices regarding

the sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a.  in intentionally failing to inform the Plaintiffs that the dosage given was
unapproved and unauthorized and the possible consequences of such unapproved
and unauthorized use, despite having warned European patients of such dangers
and recommended full dose treatment;

b.  in affirmatively representing that the drug given at "low dose" and further
contaminated with virus, glass, rubber and steel particles will successfully treat
Fabry disease and Fabry disease patients will benefit from use of a "low d ;

c.  in willfully placing a misleading and incorrect label with the product since
Genzyme substantively banned all patients in the U.S. from receiving the FDA
approved dosage of 1mg/kg every two weeks as detailed in the label;

d.  in affirmatively representing that the drug given at full dosage every two weeks
would be sold to Nevada citizens at various dates, but breached such promises
repeatedly since June 2009;

e.  in barring Nevada physicians from administering the prescribed and lawful
recommended dose of Fabrazyme and barring Nevada Fabry patients from
receiving an FDA approved dose as mandated by the FDA and in accordance with
the indications of the product insert;

f.  in expressly or impliedly misrepresenting that the "low dose" and further
that the adulterated Fabrazyme was provided in accordance with statutory
mandates and safe and efficacious for use in treating Fabry disease
despite having overwhelming knowledge to the contrary; and

g.  in expressly and impliedly misrepresenting that injection with vesivirus-
containing Fabrazyme is harmless, non-immunogenic, without impact on
the efficacious treatment of Fabry disease with Fabrazyme, even though
no medical testing had ever been undertaken to establish the objective truth
of such material medical claims and further concealing previously

48

published medical literature rendering such statements as to medical safety of vesivirus injection as false.

172.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Toni Cordova, individually and on behalf of all others similarly situated, as set forth herein in Count XII.

172.   As a direct and proximate result of the aforesaid injuries, Toni Cordova, all others similarly situated, have suffered damages, as set forth herein in Count XII.

WHEREFORE, Toni Cordova demand judgment individually and on behalf of all others similarly situated, against Defendant Genzyme-Sanofi corporation for damages from Defendant's actions in an amount in excess of $75,000.00.   JURY TRIAL DEMANDED.

COUNT XIII: NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATION (N.C.G.S. § 75-1.1 et seq.) JAMES MATTHEWS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI CORPORATION

173   The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

174.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant Genzyme's deceptive acts or egregious practices:

    a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.   in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;

c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to North Carolina citizens at various dates, but breached such promises repeatedly since June 2009;

e.  in barring North Carolina physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring North Carolina Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.  in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.  in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false

175.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of James Matthews, individually and on behalf of all others similarly situated, as set forth herein in Count XIII.

176.    As a direct and proximate result of the aforesaid injuries James Matthews has suffered damages, and all others similarly situated, as set forth herein in Count XIII.

WHEREFORE, James Matthews individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with treble damages and costs of suit. JURY TRIAL DEMANDED.

COUNT XIV: PENNSYLVANIA UNFAIR TRADE PRACTICES CONSUMER PROTECTION LAW VIOLATION (73 P.S. §§201-1 - 201-9.2)

50

GEORGE DEMKO , AND MICHAEL MASULA, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI
CORPORATION

177.   The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.

178.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted

directly and proximately from Defendant Genzyme's deceptive acts or practices regarding the

sale and use of Fabrazyme, generally, and in the following particulars:

a.   in intentionally failing to inform the Plaintiffs that the dosage given was
unapproved and unauthorized and the possible consequences of such unapproved
and unauthorized use, despite having warned European patients of such dangers
and recommended full dose treatment;

b.   in affirmatively representing that the drug given at "low dose" and further
contaminated with virus, glass, rubber and steel particles will successfully treat
Fabry disease and Fabry disease patients will benefit from use of a "low d ;

c.   in willfully placing a misleading and incorrect label with the product since
Genzyme substantively banned all patients in the U.S. from receiving the FDA
approved dosage of 1mg/kg every two weeks as detailed in the label;

d.   in affirmatively representing that the drug given at full dosage every two weeks
would be sold to Pennsylvania citizens at various dates, but breached such
promises repeatedly since June 2009;

e.   in barring Pennsylvania physicians from administering the prescribed and lawful
recommended dose of Fabrazyme and barring Pennsylvania Fabry patients from
receiving an FDA approved dose as mandated by the FDA and in accordance with
the indications of the product insert;

f.   in expressly or impliedly misrepresenting that the "low dose" and further
that the adulterated Fabrazyme was provided in accordance with statutory
mandates and safe and efficacious for use in treating Fabry disease
despite  having overwhelming knowledge to the contrary; and

g.   in expressly and impliedly misrepresenting that injection with vesivirus-
containing Fabrazyme is harmless, non-immunogenic, without impact on
the efficacious treatment of Fabry disease with Fabrazyme, even though
no medical testing had ever been undertaken to establish the objective truth
of such material medical claims and further concealing previously
published medical literature rendering such statements as to medical safety
of vesivirus injection as false.

179.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and

conditions of George Demko and Michael Masula, individually and on behalf of all others similarly situated, as set forth herein in Count XIV.

180.     As a direct and proximate result of the aforesaid injuries, Plaintiffs George Demko, and Michael Masula,  and all others similarly situated, have suffered damages, as set forth herein in Count XII.

WHEREFORE,   Plaintiffs George Demko  and Michael Masula, individually and on behalf of all others similarly situated, demand   judgment   against   Defendant Genzyme-Sanofi corporation  in an amount in  excess  of  $75,000.00,  together  with  treble  damages and  costs  of  suit.  <u>JURY  TRIAL</u>  <u>DEMANDED</u>.

<u>COUNT XV: VIRGINIA CONSUMER PROTECTION ACT VIOLATION</u>
(VA. CODE § 59.1 et seq.)
SYDNEY JOHNSON, PLAINTIFF D.J., DAMON LAFORCE;
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED v. GENZYME-SANOFI CORPORATION

181.     The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

182.     All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant Genzyme's deceptive acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

  a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;
  b.  in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;
  c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Virginia citizens at various dates, but breached such promises repeatedly since June 2009;

e.  in barring Virginia physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Virginia Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.  in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite  having overwhelming knowledge to the contrary; and

g.  in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

183.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of the named plaintiffs, individually and on behalf of all others similarly situated, as set forth herein in Count XV.

184.   As a direct and proximate result of the aforesaid injuries of Plaintiffs, and all others similarly situated, have suffered damages as set forth herein in Count XV.

WHEREFORE, named plaintiffs individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation  in an amount in excess of $75,000.00, together with treble damages and costs of suit. JURY TRIAL DEMANDED.

COUNT XVI: VIRGINIA  PROHIBITION OF FALSE  ADVERTISING
VIOLATION  (VA. CODE § 59.1 et seq.)
SYDNEY JOHNSON, PLAINTIFF D.J.; PLAINTIFF S.J.; DAMON
LAFORCE; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED v. GENZYME-SANOFI CORPORATION

185.   The preceding paragraphs are incorporated by reference as though set forth here in their

entirely.

186.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted

directly and proximately from Defendant Genzyme's acts or practices regarding the sale and

use of Fabrazyme, generally, and in the following particulars:

      a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

      b.   in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low d ;

      c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

      d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to Virginia citizens at various dates, but breached such promises repeatedly since June 2009;

      e.   in barring Virginia physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Virginia Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

      f.   in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite  having overwhelming knowledge to the contrary; and

      g.   in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

187.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and

conditions of the named Plaintiffs, individually and on behalf of all others similarly situated,

as set forth herein in Count XVI.

188.    As a direct and proximate result of the aforesaid injuries of the named Plaintiffs,

individually and on behalf of all others similarly situated, as set forth herein in Count XVI.

WHEREFORE, the named Plaintiffs individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation  in an amount in excess of $75,000.00, together with treble damages and costs of suit. JURY TRIAL DEMANDED.

> COUNT XVII: VIRGINIA  WRONGFUL DEATH (Code of Virginia  §8.01-50) or in the alternative SURVIVAL ACTION CLAIMS (Code of Virginia §8.01-25)
> EDDIE VIERS, individually and as administrator of THE ESTATE OF TERESA VIER;  WITH WILLIAM MCNEW ;  JEANNE WALLACE, individually and as administrator of THE ESTATE OF JOSEPH WALLACE; WITH JAMES WALLACE; AND WITH SAMUEL WALLACE; , INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME-SANOFI CORPORATION

189.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

190.    Eddie Viers, individually and as Administrator of the Estate of Teresa Viers brings this action on behalf of the beneficiaries under and by virtue of the Wrongful Death Act, Code of Virginia  §8.01-50, and the applicable rules of civil procedure and decisional law.

191.    Jeanne Wallace, individually and as Administrator of the Estate of Teresa Viers brings this action on behalf of the beneficiaries under and by virtue of the Wrongful Death Act Code of Virginia  §8.01-50, and the applicable rules of civil procedure and decisional law.

192.    As a result of the negligent acts and omissions of defendant, Teresa Viers and Joseph Wallace were caused grave injuries and death resulting in the entitlement to

damages to those individuals defined as beneficiaries under the Wrongful Death Act.

193.    The named administrators claim all administrator's expenses recoverable under

the Wrongful Death Act, including, but not limited to damages for hospital, medical,

funeral and burial expenses and all expenses of administration made necessary because

of Teresa Viers and Joseph Wallace's deaths.

194. The Wrongful Death Act beneficiaries of the Estate of Teresa Viers are:

      a. Eddie Viers, spouse; and

      b.  William McNew, son.

195. The Wrongful Death Act beneficiaries of the Estate of Joseph Wallace are:

      a. Jeanne Wallace, spouse;

      b. James Wallace, son and

      c.  Samuel Wallace, son.

196. On behalf of wrongful death beneficiaries, the Administrators claims damage for

monetary support that decedents would have provided to the beneficiaries during their

lifetime, including, but not limited to the support provided or which could have been

expected to have been provided to the beneficiaries.

197. On behalf of the Wrongful Death Act beneficiaries, the Administrators claim

damages for loss of companionship, comfort, society, guidance, solace, and protection

by the decedents.

198. On behalf of the wrongful death beneficiaries, the Administrator claims damages

for the full damages allowed under the Wrongful Death Act of Virginia and decisional

law interpreting the Act.

WHEREFORE, plaintiffs demand damages against defendant in an amount in excess of

$50,000.00, exclusive of pre-judgment interest, post-judgment interest and costs.


### AND IN THE ALTERNATIVE--SURVIVAL ACTION


199.    On behalf of the Survival Action beneficiaries under Code of Virginia § 8.01-25, the Administrators claim all loss of income, retirement, and social security income as a result of the deaths of Teresa Viers and Joseph Wallace.

200.     On behalf of the Survival Act beneficiaries, the Administrator claims damages for the pain, suffering and inconvenience endured by Teresa Viers and Joseph Wallace, including, but not limited to their physical pain and suffering and mental pain and suffering.

201.    Plaintiffs claim the full measure of damages under the Survival Act and decisional law interpreting the Act.

WHEREFORE, plaintiff demands damages against defendant in an amount in excess of $50,000.00 under the Survival Act, exclusive of prejudgment interest, post-judgment interest and costs.


### COUNT XVIII:   WASHINGTON UNIFORM DECEPTIVE TRADE PRACTICES  ACT VIOLATION (RCW § 19.86.010 et seq.) AMBER BRITTON; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. SANOFI CORPORATION

202.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

203.    All of the resultant losses, damages, and injuries sustained by Plaintiff resulted directly and proximately from Defendant Genzyme's deceptive acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

      a.   in intentionally failing to inform the Plaintiff that the Fabrazyme she was administered contained vesivirus and vesivirus fragments, and

      b.   in expressly and impliedly misrepresenting that injection with vesivirus containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false.

204.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Plaintiffs Amber Britton, individually and on behalf of all others similarly situated, as set forth herein in Count XVIII.

205.    As a direct and proximate result of the aforesaid injuries of Plaintiffs Amber Britton, and, and all others similarly situated, have suffered damages, as set forth herein in Count XVIII.

      WHEREFORE, Plaintiff Amber Britton, demand judgment individually and on behalf of all others similarly situated, against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with treble damages and costs of suit. <u>JURY TRIAL DEMANDED</u>.

<u>COUNT XIX: WASHINGTON PRODUCT LIABILITY ACT VIOLATION</u>
<u>(R.C.W. § 7.72 et seq.)</u>
AMBER BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED v. GENZYME-SANOFI
CORPORATION

206.    The preceding paragraphs are incorporated by reference as though set forth here in their entirely.

207.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's practices regarding the manufacture, sale, contract for sale, and use of the drug, Fabrazyme, generally, and in the following particulars:

a.   in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Framingham, MA plant;

c.   in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with vesivirus;

d.   in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus;

i.   in that the Defendant failed to report the effects of vesivirus on Fabry patients;

j.   in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of contaminated Fabrazyme;

n.   in that the Defendant affirmatively represented that the drug c o n t a m i n a t e d with virus will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.   in that the Defendant expressly or impliedly misrepresented that the adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

t.   in that the Defendant  marketed and sold Fabrazyme being contaminated with vesivirus, which is not fit for the ordinary purpose for which it is customarily or foreseeably used  and in contravention to WA anti-adulteration law (RCW § 69.04.410-440);

u.   in that the Defendant knew or should have known that the adulterated drug is dangerous and likely to cause damage to users;

v.   in that the Defendant  manufactured and sold Fabrazyme being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

x.   in that the Defendant  knew or should have known, that due to the inherently dangerous nature of the design of virally infected Fabrazyme, it should have provided warnings on the product to protect users;

y.   in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving vesivirus and failed to warn physicians and users of known or knowable dangers;

z.    in that the Defendant did not disclose to the physicians and users that the Fabrazyme was defectively and unreasonably designed, thereby making the  product dangerous to use;

aa. in that the Defendant willfully included an incorrect and unapproved product insert  that does not apply to adulterated Fabrazyme;

bb. in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating,

manufacture, testing, labeling as well as supplying Fabrazyme;

cc. in that the Defendant expressly and impliedly warranted that virus tainted Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd. in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of vesivirus injection as false;

ee. in negligently marketing Fabrazyme known to be untested, contaminated, adulterated for treatment of Fabry disease; and

ff. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

208.   By its actions, Defendant is liable for the severe injuries and conditions of Amber Britton, individually and on behalf of all others similarly situated, as set forth herein in Count XIX.

209.   As a direct and proximate result of the aforesaid injuries, Amber Britton and all others similarly situated, have suffered damages, as set forth herein in Count XIX.

WHEREFORE, Plaintiffs Amber Britton individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with punitive damages, and costs of suit.  JURY TRIAL DEMANDED.

## COUNT XX: LOSS OF CONSORTIUM

LISA BISHOP; DARLENE COOKINGHAM; JILL CORTINA;  NATE BROOKS; ERIN MASULA; WENDY STANZIANO; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, v. SANOFI CORPORATION

210.   Paragraphs 1 through 384 of the Complaint are incorporated as if set forth fully at length herein.

211.   As a direct and proximate result of the injuries sustained by their spouses, Plaintiffs

have been damaged as follows:

    a.   Plaintiffs have been and will continue to be compelled to expend large sums of money for medical care, supplies, appliances, and medicine;

    b.   Plaintiffs have been and may be compelled to expend large sums of money for hiring help to perform household duties previously performed by their spouses; and

    c.   Plaintiffs have been and will be deprived of their spouse's aid, comfort, assistance, companionship, and consortium.

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, demand judgment against Defendant Genzyme-Sanofi corporation in an amount in excess of $75,000.00, together with treble damages and costs of suit.

<u>JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE</u>

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request the following relief:

a.   Certification of this action or common issues herein as a class action;

b.   A determination of common issues and claims in a unitary, consolidated or class-wide trial pursuant to Fed. R. Civ. P. 23 and/or Fed. R. Civ. P 42;

c.   An award of compensatory damages to each injured class member in an amount deemed appropriate by the trier of fact;

d.   An award of punitive damages for acts and omissions of Defendant found to be willful and wanton, outrageous, and made with wickedness and reckless indifference to Plaintiffs' lives, health and interests;

e.   An award of compensatory, equitable and/or restitution damages according to proof and for all applicable damages, remedies, and relief under applicable federal and state statutes including medical monitoring;

f.   An award of costs of suit; and

g.   Any other and further legal and/or equitable relief to which Plaintiffs might be entitled at law or which this Court deems proper.

**JURY TRIAL DEMANDED**

Respectfully submitted this 29th day of February 2020.

For the Plaintiffs,

*/s/ C. Allen Black*
C. Allen Black
LAW OFFICE OF C. ALLEN BLACK
1579 Montgomery Rd.
Allison Park, PA 15101
Telephone: 412.908.3268
E-mail: drallenblack@gmail.com